## Libhart *against* Wood.

Faithful service is a condition precedent to the right of a servant to his wages; and if, during the term for which he has agreed to serve, he commit a criminal offence, although not immediately injurious to the person or property of his master, he will not be entitled to recover any part of his wages.

**ERROR** to the Common Pleas of *Dauphin* county.

Charles A. Wood for use against Jacob Libhart. This was an action of *assumpsit* by the plaintiff, who was a servant on board a packet-boat on the canal, commanded by the defendant, to recover his wages for seven months' service. Upon the plea of payment, the defence was, that during the period for which the plaintiff was employed, he committed a larceny of a passenger's trunk on board of the boat, for which he was arrested and convicted. The proof was as follows:

It is admitted, after the assignment, Wood was convicted of larceny (in this court), on a boat commanded by the defendant, Captain Libhart, and was arrested on the 4th of November, 1839: he was employed on the packet-boat, John Marshall; Wood requested me to write to Mr Fisher, at Lebanon.

It is admitted by the defendant's counsel, that Charles Wood was in the employ, and laboured for the defendant from 26th of March 1839, to November 4th, 1839, on board the packet-boat, John Marshall, where the larceny was committed by the said Wood, of which he was convicted.

John Davis, Esq. I understood from the defendant that Wood and Smith were to receive $20 per month each; he said he had hired them on board the boat, and they were to stay out the season; they were brought before me on the 4th of November 1839; I do not know when the season closed; it was after November 1839 this transaction was had.

Captain Morton. The boating season closed on the 15th; the boats were closed up and stopped about the 17th of November;

[Libhart v. Wood.]

I continued here till the night of the 15th; do not know whether Libhart laid up on the 15th; do not know the time.

I know nothing about this hiring; but the custom has been that, when they are hired for the season, and they do not stay it out, they deduct two dollars per month from their wages, unless they are compelled to quit by unavoidable accident. It is the duty of the outside hand to guard the boat. When we go into port, one bowsman and one steersman is up at a time; one principal part of their duty is to guard the boat. Mr Colder was one of the proprietors of the boat: I paid my hands $20; the captains employ these hands—pay themselves.

Captain Green. I have been captain of a boat four or five years; it has been a rule to hire hands in the spring for the entire season; I do not know it is now; if they left before the season, I usually dock them two or three dollars; I had previously engaged Wood in the fall; in the spring he came to me and said he would go with defendant — this was Smith; I never heard Wood say any thing about it; the duty of the boat hands is to take care of the baggage.

Captain Voglesong. I hire my hands generally for the entire season; if they left before the season, I have always paid what I contracted; I paid as high as $18 or $20 per, month; some new hands I got for $16.

James Martin. I was a hand on this boat of Libhart's when Wood was there; I contracted, I think, for the entire season; I made no particular bargain; I made no bargain that if I left he should dock me; I was docked for leaving the boat. There were six hands on the boat at Hollidaysburg; we were all detained here, the four hands that belonged to the boat. I do not know how many hands he employed; Decker and me were all of the old crew; they were employed five days. I would not care about hiring at $1.50 per day; my wages remained on while' I was here. Wood was a steersman to steer the boat, and reach off and take care of the baggage. The night the larceny was committed, it was Wood's business to guard the boat, and Captain Libhart did not come down with his boat that trip; all the hands were arrested, and charged with the larceny; Libhart's boat ran two or three trips after this; Captain Moore brought the boat to town that night; I have heard that the money was found in Mifflin county.

The counsel for the defendant asked the court to charge the jury, as a matter of law, that the moment Wood committed the larceny, he lost all right to recover his wages in this action from the defendant; and also that by the act his right of action is defeated.

But this instruction the court decline to give—for two reasons:

1. That it does not appear that he, Wood, ever took any property that belonged to defendant. In the case cited by the coun-

[Libhart v. Wood.]

sel, it was a suit on an implied contract; and in the case at bar, there is an express contract proved. Whatever property, whatever special or immediate loss of goods or property the defendant has sustained, it would be right for the jury to consider.

2. But simply because Wood stole the goods or money of a passenger on board the boat, I know of no rule of law that should defeat his right to receive what is justly due, deducting any legal off-sets the defendant may have.

I can imagine no rule of morals or religion, that would justify the defendant doing a wrongful act, by retaining the just dues and wages of a labourer, because the plaintiff has commited a crime.

The jury would be justified in giving a verdict for the plaintiff for what the defendant contracted to pay, deducting what he is entitled to by way of set-off under the evidence, and according to the rules of law which I have stated.

The defendant's counsel excepted to the charge of the court.

*Adams*, for plaintiff in error, argued that, inasmuch as it was the particular duty of the plaintiff to guard the boat and the baggage of passengers, the commission of a larceny upon that very property, was such a violation of his contract with the master, as precluded all right to recover compensation under a contract, the peculiar consideration of which was faithfulness. The principle does not rest in the amount stolen, or from whom stolen, but in the fact that property was stolen; that the consideration of the contract failed. 19 *Eng. Com. Law Rep.* 346; 3 *Eng. Com. Law Rep.* 339; 25 *Eng. Com. Law Rep.* 257; *Chit. Gen. Prac.* 81; 23 *Law Lib.* 20; 2 *Stark. Ev.* 942; 2 *Pick.* 271; 4 *Serg. & Rawle* 249; 3 *Paley Phil.* 112.

*J. A. Fisher*, for defendant in error. The defence does not rest upon any injury done to the defendant, nor any larceny committed upon his goods; and no case shows that, under such circumstances, the plaintiff must lose the price of his labour. The case of *Heck* v. *Shener* (4 *Serg. & Rawle* 249) seems to be conclusive of this point.

The opinion of the Court was delivered by

ROGERS, J.—When a servant, who has engaged for a certain time at certain wages, is turned away by his master before the period for which he has engaged to serve has expired, and his dismissal be in consequence of his own misconduct, he will be entitled to no wages; for his faithful service is a condition precedent to his right to wages, and that condition, in the case supposed, he has not performed. But if his dismissal be unjust, the master can not, by his wrongful discharge, prevent the servant from recovering a compensation for his services. Thus the law carefully protects the rights of both master and servant. 19 *Eng. Com. Law*

*Rep.* 346 ; 3 *Eng. Com. Law Rep.* 339 ; 25 *Eng. Com. Law Rep.* 257. In the case at bar, the hiring was for the season, at the rate of $20 per month, and although, in one sense, it may not be thought a hiring for a certain time, yet it can not be disputed, that it falls within the reason of the principles stated. By the contract, the servant agrees to serve his master faithfully for that period of time, although the termination of it may be longer or shorter, as the weather may be more or less severe. It is an express contract, but no difference is perceived between an express or implied contract; in either case it is open to the defendant, by way of defence, to insist that the plaintiff has failed to comply with his agreement. Nor is there that want of mutuality in the contract, which (as is supposed) can interfere with the defence. Both parties are bound by it. It can not affect the case, that it is part of the agreement that the master may at any time discharge the servant, unless a corresponding right to leave his service is reserved to the servant. Nor would it, I apprehend, even then prevent the enforcement of a penalty for wilful misconduct : public utility requires that the rule should be strictly observed. It must be admitted, that whether the servant be dismissed by his master for good cause, or he incapacitates himself from performing his part of the contract, as was the case here, can make no manner of difference in the application of the rule. The learned judge seems to suppose that there is a distinction between a larceny committed of the goods of the employer, and a stranger. But we do not feel the force of the distinction, nor can we perceive that the defence fails because the defendant omitted to prove that he sustained direct injury from the misconduct of the plaintiff. There is good sense in the observations of Lord Tenterden, (*Chit. Gen. Prac.* 81.) that if a servant habitually embezzled his master's property, the amount embezzled is wholly immaterial; and although the amount of wages sought to be recovered may exceed the amount embezzled, the servant is not entitled to anything. It may be impossible to ascertain the amount of injury a common carrier or inn-keeper may sustain from the unfaithful conduct of his servant, and therefore no direct proof of it ought to be required. It is often, from its nature, not susceptible of such proof. An injury, in the case of an inn-keeper or common carrier, is inevitable, where he is so unfortunate as to employ dishonest servants; it must affect his business or the character of his house, although it may be impossible to show the extent of the injury. It is nothing, therefore, that in this particular case, the goods stolen were restored. Indeed, here there was a direct injury to the master, as, for one trip at least, he was deprived of the services of all his hands, in consequence of the dishonesty of the plaintiff. And who can say, and particularly in the business in which the defendant was engaged, that the services of a dishonest servant are worth anything, or who would knowingly employ

[Libhart v. Wood.]

such a servant? His services, in the apprehension of every person, are worse than useless. In addition, the rule which deprives them of wages for improper conduct, has this recommendation, that it operates as an incentive to a faithful discharge of duty. It is a narrow view of the question, to suppose that it is intended for the benefit of the master alone. There are other considerations which enter into the subject, of a still higher nature. It contributes to the security of travellers, who are compelled to intrust their property to the custody of others. The intercourse between the different sections of our extensive empire is so great, that sound policy requires that every possible protection should be extended to them; and so far from believing that the defendant is offending against any principle of ethics, in retaining the wages of his unfaithful servant, in my judgment, he is discharging a duty, which he alike owes to himself and the public. We do not wish to extend the principle so far, as to forfeit wages already earned, on a contract which is at an end. But when the contract is entire, (and we conceive this to be a case of that description) although it may be for payment of wages monthly, he precludes himself from recovering the arrearages of his wages, when he is guilty of embezzlement or pillage, either from the master or a stranger. It may be unnecessary to add, that the same rule extends to common carriers, whether of passengers or goods, and to inn-keepers.

Judgment reversed, and a *venire de novo* awarded.